# IN THE UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| CONTROL SOLUTIONS LLC, | ) |
| Plaintiff, | ) |
| v. | ) Case No. 10 C 121 |
| OSHKOSH CORPORATION, | ) Judge Sharon Johnson Coleman |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Control Solutions ("CS") is the manufacturer of specialty powered door systems and defendant Oshkosh is the manufacturer of armored vehicles. Control Solutions filed a four Count Complaint alleging that it had either an express or implied contract to supply Oshkosh with all its requirements for powered door systems to be used in a line of armored vehicles. Control Solutions claims that Oshkosh breached that contract by purchasing powered door systems from another manufacturer instead of from Control Solutions. Oshkosh asserts that the parties were merely engaged in negotiations that never resulted in a contract. Both parties filed motions for summary judgment. The Court heard oral arguments on the motions on June 19, 2012. As set forth below, this Court denies Control Solutions' Motion for Partial Summary Judgment and grants Oshkosh's Motion for Summary Judgment.

**Oshkosh's Motion to Strike**

Before addressing the merits of the motions for summary judgment, this Court will consider Oshkosh's Motion to Strike [doc. 110]. Two of the objections raised in Oshkosh's motion to strike Control Solutions' filings in support of its motion for summary judgment have been resolved by CS

submitting a corrected brief that conforms to the 30 page limitation imposed by the Court and cites to the paragraphs of the 56.1 statement of facts. The remaining issue relates to two declarations CS submitted in support of its motion for summary judgment: the declaration of Jorge Jimenez and of Michael McKee.

Oshkosh argues that the declarations of Jorge Jimenez and Michael McKee should be stricken as prejudicial. In support of its motion, Oshkosh argues that CS refused to make Jimenez and McKee available for deposition and therefore it would be prejudicial to allow CS to use their declarations in support of its motion for partial summary judgment. CS responds that Oshkosh's motion is untimely because Oshkosh did not depose Jimenez and McKee due to a discovery dispute that arose in late July 2011 as discovery was set to close on July 28, 2011, and Oshkosh did not seek to compel the depositions or any other relief at that time. Oshkosh did move to compel the deposition of Ellen Schramm[1] another CS witness, but did not seek the same relief for McKee and Jimenez.

Discovery in this case was set to close on July 28, 2011, however, the parties scheduled five deposition between July 29 and August 5, 2011: Control Solutions was going to produce three witnesses, including Jimenez (former Manager of Mechanical Engineering, Schramm (former Contracts Administrator), and McKee (Chief Technology Officer), and Oshkosh agreed to produce a Fed. R. Civ. P. 30(b)(6) witness and Joseph Gardemal (its expert witness). On July 28, 2011, a dispute arose between the parties over the scope of the 30(b)(6) deposition notice. The parties were unable to reach an agreement over the scope of the deposition. CS decided not to produce its witnesses since Oshkosh would not produce theirs. As a result, none of the five depositions scheduled after July 28, 2011, were taken as scheduled, though Schramm was later deposed after Oshkosh moved to compel her deposition.

---

[1] This Court granted Oshkosh's motion to compel the deposition of Ellen of Schramm on August 24, 2011.

Rule 37 provides that upon failure of a party to comply with a discovery request, a party may move the Court to enter an order compelling the noncomplying party to disclose the relevant information. Fed. R. Civ. P. 37; *see e.g., Nichols v. Chicago*, 1992 U.S. Dist. LEXIS 6069, *8-9 (N.D. Ill. Apr. 29, 1992) (denying plaintiff's motion in limine to exclude certain documents on the basis that plaintiff failed to comply with Rule 37 and compel the production of the documents); *see also Rossetto v. Pabst Brewing Co.*, 217 F.3d 539, 542 (7th Cir. 2000) (affirming denial of a party's discovery motion filed two months after the close of discovery where the party offered no reason for the delay).

Oshkosh offers no explanation why it failed to move to compel the depositions of McKee and Jimenez. Certainly, Oshkosh could have done so as it did with Ellen Schramm. Oshkosh should not now be allowed to object to the use of the declarations on the basis that Oshkosh was not able to depose them when it never sought to compel their depositions. Oshkosh filed its motion to strike the declarations on October 7, 2011, more than two months after discovery had closed and it knew that the depositions would not go forward as scheduled. Integral to Oshkosh's argument to strike the declarations is that McKee and Jimenez's failure to appear for their scheduled depositions is sanctionable under Rule 37(d) because they are "managing agents" or "officers" of the company. Yet, Oshkosh never sought to enforce its right to take the depositions. The motion to strike is denied.

**Control Solutions' Motion for Partial Summary Judgment**

On January 8, 2010, Control Solutions filed a four Count Complaint alternatively alleging breach of an express supply contract, breach of an implied-in-fact supply contract, unjust enrichment, and promissory estoppel. Control Solutions argues that it is entitled to summary judgment in its favor on liability because either an express contract was formed whereby Oshkosh agreed to purchase power door systems designed and manufactured by CS, if Oshkosh received a

federal government contract to produce a military vehicle known as the "M-ATV," or the parties course of dealing in Spring 2009 created an implied-in-fact contract. CS further argues that Oshkosh breached the contract when it failed to purchase CS' power door system after the government ordered the M-ATV with door armor kits from Oshkosh. CS requests a trial on damages.

**Oshkosh's Motion for Summary Judgment on all Counts**

Oshkosh argues that it is entitled to judgment as a matter of law because no valid and enforceable contract was ever formed between the parties. Oshkosh contends that CS did not make an objective offer, Oshkosh did not accept an offer, and the purported contract does not contain all the required material terms. Oshkosh further argues that any purported contract is unenforceable under the Statute of Frauds. Additionally, Oshkosh moves for summary judgment arguing that there is no valid underlying action to support CS' unjust enrichment claim and, even if there were, the record lacks any evidence that Oshkosh unjustly retained any benefits provided by CS. Oshkosh also asserts that since the elements of a valid contract are lacking, CS cannot prevail on a claim for promissory estoppel.

Alternatively, Oshkosh argues that if the Court denies its motion for summary judgment on the contract claims, the Court should grant partial summary judgment denying at least $179,251,940 of CS' claimed damages. Oshkosh argues that most of CS' claimed damages are too speculative. More specifically, Oshkosh contends that the "unabsorbed overhead costs" were not caused by the alleged breach, and are not recoverable. The lost profits and "unabsorbed overhead costs" are not recoverable under Count III for unjust enrichment because it is measured by a defendant's gains, not the plaintiff's losses. Those damages are not recoverable under Count IV for promissory estoppel either because the proper measure of damages would be those necessary to restore CS to the position it was in prior to its reliance on Oshkosh's promise.

**Background**

Plaintiff Control Solutions designs and manufactures control and user interface devices used in a variety of commercial, military, and medical applications. For military uses, such as the one at issue here, Control Solutions' products include power door systems ("PDS"), which are used to open and close doors on armored military vehicles. Oshkosh Defense is a division of Oshkosh Corporation that manufactures armored and tactical vehicles for military applications.

In December 2008, the Department of Defense issued a solicitation for the competitive procurement of mine-resistant all terrain vehicles ("M-ATV"). The M-ATV is a type of armored fighting vehicle designed to withstand improvised explosive devices ("IED") with improved off-road mobility over earlier generations of the vehicle. M-ATVs are designed to be equipped with armor upgrade kits ("EFP kits" for explosively formed penetrators) for a higher degree of protection against armor-piercing munitions. The EFP kits require power door assistance because of the extra weight they add to a standard M-ATV door. The Department of Defense contract was to be "indefinite delivery, indefinite quantity" ("IDIQ") and gave the government the option to purchase up to 10,000 M-ATVs over three years. It also gave the government the option to buy one EFP kit for up to every M-ATV delivered.

In January 2009, Oshkosh asked CS to develop a prototype door assist or powered door system for vehicles that would be equipped with the EFP kits. CS delivered the first prototype, a modification of its standard PDS, in February 2009. Oshkosh used the prototype PDS to equip its marketing vehicle, which was displayed in an Association of the Unites States Army trade show in February and nearly twenty other marketing events. On March 2, 2009, Kent Schulte a project engineer at Oshkosh requested a "formal production quote" from CS "based on volumes of one EFP kit per vehicle produced." On March 6, Control Solutions quoted $5,800 per PDS unit.[2] Control

---
[2] Each M-ATV vehicle has four doors and would need four PDS units when equipped with the EFP armor kits. Put another way, one EFP kit contains four PDS units.

5

Solutions agreed to absorb the cost of the original prototype as well as the research and development costs.

In March 2009, the Department of Defense selected Oshkosh as one of the manufacturers to proceed to the next phase of contract bidding. The Department of Defense then gave each of the selected manufacturers a contract to provide three vehicles for testing and evaluation by the Army with one "production representative" EFP kit to be delivered for testing with the vehicles. Throughout March and April 2009 Control Solutions continued to work with Oshkosh to develop and refine the design of the PDS. On April 21, 2009, Oshkosh sent CS a purchase order for four PDS units to make up the EFP kit for testing by the Army. The purchase order incorporated Oshkosh's Terms and Conditions, including a merger clause stating that the purchase order constituted the entire agreement between the parties up to that point, "superseding any and all previous communications and negotiations." Oshkosh paid $46,000 for the four PDS units.

In May and June 2009, Control Solutions continued to develop the design of the PDS. In a meeting on May 6, 2009, Travis Schmuhl, Oshkosh Segment Commodity Manager asked Control Solutions to agree in writing that it would be able to meet the 60 day delivery schedule. In an email on May 11, 2009, CS stated that it could meet the "DX" requirements, but did not specifically address the delivery schedule. On June 11, 2009, in response to another production price quote request, CS submitted its standard delivery schedule of 14 to 16 weeks and stated "we will strive to meet your delivery requirements." The price quote also says that it is "for estimating purposes only and is subject to change."

In early June, CS received an annotated "Statement of Work" from Oshkosh outlining which of Oshkosh's specifications had been met. Oshkosh accepted nearly all of the specifications for the design. CS asserts that Oshkosh accepted the remainder of the outstanding design requirements by late June, but presents no documentation to show establishing that fact. Oshkosh disputes that the

design was ever finalized. With respect to the price term, Oshkosh admitted in its Answer to the Complaint that on June 24, 2009, Schmuhl accepted Control Solutions' final production price quote from June 11, 2009. Oshkosh used that price quote to calculate the pricing of its M-ATV equipped with EFP kits for its bid to the government. On June 15, 2009, Oshkosh's design engineer Scott Mueller emailed CS to set up a meeting "discussing how the Control Solutions' PDS will be purchased for M-ATV."

On June 30, 2009, the Army awarded the contract to Oshkosh, but the contract procured only the baseline M-ATV. The EFP kits were to be procured under a separate, subsequent contract. After the contract was awarded to Oshkosh, the engineers at Oshkosh and CS exchanged congratulatory text messages. In a July 7, 2009, power point presentation created by Oshkosh for Plasan, one of the slides states that "Oshkosh has made a production supplier selection for this item," referring to the PDS, though there is no mention of CS. On July 14, 2009, Oshkosh informed CS that it would be competing the PDS sub-contract. In late August 2009, Oshkosh entered an agreement with Parker Oildyne to supply the PDS units. The Army awarded Oshkosh the separate EFP kit contract on December 24, 2009.

**Legal Standard**

A party is entitled to summary judgment if all of the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). When considering a summary judgment motion, the Court construes the facts and all reasonable inferences in the light most favorable to the non-moving party. *Abdullahi v. City of Madison*, 423 F. 3d 763, 773 (7th Cir. 2005). The party who bears the burden of proof on an issue may not rest on the pleadings or mere speculation, but must affirmatively demonstrate that there is a genuine issue of material fact that requires a trial to resolve. *Celotex v. Catrett*, 477 U.S. 317, 324 (1986). On cross-motions, summary

judgment is appropriate only when evidence as a whole shows there is no genuine dispute as to any material fact, *Davis v. Time Warner Cable of Southeastern Wis., L.P.*, 651 F.3d 664, 671 (7th Cir. 2011), regardless of which motion the evidence is attached. *Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 532 (9th Cir. 2011).

In order to prevail on a breach of contract claim, the plaintiff must prove: (1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) breach of the agreement by the defendant; and (4) injury to the plaintiff resulting from the breach. *Henderson-Smith & Associates, Inc. v. Nahamani Family Services Center, Inc.*, 323 Ill. App. 3d 15, 27 (2001).

**Discussion**

1. *Express Contract (Count I)*

Formation of an express contract requires: an offer, acceptance, consideration and mutual assent to definite and certain terms. *See, e.g., Cogswell v. Citifinancial Mortgage Co., Inc.*, 624 F.3d 395, 398 (7th Cir. 2010). Control Solutions argues that an express contract was formed by June 2009 because the parties had expressly agreed on all essential terms of this contract. CS alleges that the contract created was for it to supply all of Oshkosh's requirements for power door systems ("PDS") for the armored vehicles it would supply to the government. CS asserts that the essential terms are the product, the price, and the anticipated delivery schedule. Oshkosh disputes that final agreement was reached on product, price and delivery and responds that those are not the only material terms of a requirements contract.

In a requirements contract, the promisor binds itself to purchase all of its requirements for a particular good "exclusively" from a specific seller. *Brooklyn Bagel Boys, Inc. v. Earthgrains Refrigerated Dough Products, Inc.,* 212 F.3d 373, 377 (7th Cir. 2000). "Under Illinois law, however, an essential element of a requirements contract is the promise by the buyer to purchase all

of its requirements, or at least a minimum quantity, from the seller." *Id.* at 379 (citing *Torres v. City of Chicago,* 261 Ill. App. 3d 499, 632 N.E.2d 54, 58, 197 Ill. Dec. 985 (Ill. App. Ct. 1994)).

CS contends that the following facts show that the parties expressly agreed on the product. In January 2009, Oshkosh contacted CS to design a powered door system for its prototype M-ATV's armored doors so that Oshkosh could bid on a federal government contract. After delivery of the initial prototype PDS, Oshkosh requested four units to use for the bid. Between March and April 2009, CS continued to develop the design of the PDS to meet Oshkosh's specifications. On April 28, 2009, CS delivered a "production representative" PDS unit to Oshkosh. The federal government required submissions to be "production representative" in order to bid on the contract. In June 2009, Oshkosh reviewed the "statement of work" and CS had met nearly all of Oshkosh's specifications. CS claims that Oshkosh accepted the remainder of the outstanding specifications in mid-late June.

CS asserts that Oshkosh's June 2009 request for a quote that it would use, and did use, to "assess its final price to the government" is evidence that it accepted the price of the PDS units. CS also points to Oshkosh's Answer to the Complaint where Oshkosh admitted that its purchasing agent Schmuhl accepted the price on June 24, 2009. Though, Oshkosh points out that the explicit terms of the June price quote stated that it is "for estimating purposes only and is subject to change." CS also contends that it agreed to the government required delivery schedule of 60 days. Oshkosh disputes that CS agreed to delivery within 60 days since CS stated that its regular delivery schedule was 14-16 weeks and CS only said it "would strive to meet the delivery required schedule."

Oshkosh argues that no express or implied contract was formed because there is no evidence and CS does not even attempt to present any evidence as to exclusivity and a minimum quantity. Oshkosh asserts that its supplier Terms and Conditions Section F(34), which CS received on the

9

purchase order from April 28, 2009, when Oshkosh purchased the four PDS prototype units from CS, specifically provides that Oshkosh has the right to terminate at its convenience any agreement with a supplier. Oshkosh also argues that the two cases cited by CS are inapposite, and do not support finding of an express requirements contract in this case.[3]

Even if this Court were to find that the parties agreed on the final product, price, and delivery schedule, there can be no express requirements contract without evidence of exclusivity and quantity. CS does not mention these terms in its motion for summary judgment and argues in response to Oshkosh's motion that this Court should infer those two terms based on the parties' course of dealing. "In a contract for the sale of goods, the court can supply all missing terms <u>except</u> the quantity term. 'While the quantity term in requirement contracts need not be numerically stated, there must be some writing which indicates that the quantity to be delivered under the contract is a party's requirements or output." (Emphasis added.) *Ray Dancer, Inc. v. DMC Corp.*, 175 Ill. App. 3d 997, 1004 (2d Dist. 1988) (quoting *Eastern Dental Corp. v. Isaac Masel Co.*, 502 F. Supp. 1354, 1364 (E.D. Pa. 1980)). Thus, this Court finds no express contract was formed between the parties and Oshkosh is entitled to judgment as a matter of law on Count I.

2. *Implied-in-Fact (Count II)*

Under Illinois law, "an implied-in-fact contract is a true contract, containing all necessary elements of a binding agreement; it differs from other contracts only in that it has not been committed to writing or stated orally in express terms, but rather is inferred from the conduct of the

---

[3] CS analogizes two cases to support its argument that an express agreement was reached between CS and Oshkosh – *Jannusch v. Naffziger*, 379 Ill. App. 2d 381 (4th Dist. 2008), and *Pritchett v. Asbestos Claims Mgmt. Corp.*, 332 Ill. App. 3d 890 (5th Dist. 2002). In *Jannusch*, the claim was for a breach of an oral contract to purchase a concession business. In that case, the defendant testified that an oral agreement to purchase Festival Foods for $150,000 existed, but she could not recall the date on which they made the agreement. In addition to the defendant having admitted the existence of a contract, the defendants had paid $10,000 as a down payment and applied for a business loan for the remainder. The defendants also took possession of the business, purchased inventory, equipment, and received income, paid taxes and employees. Therefore, the Illinois Appellate Court found the parties had entered an express oral contract. *Pritchett* is even less analogous to the case at bar. There, the court considered an appeal from a judgment to enforce a settlement agreement. The court found accord and satisfaction from the payment of a portion of the settlement and a letter confirming the settlement.

parties in the milieu in which they dealt." *AEI. Music Network, Inc. v. Business Computers, Inc.*, 290 F.3d 952, 956 (7th Cir. 2002); *Dynegy Mktg & Trade v. Multuit Corp.*, 648 F.3d 506, 517 (7th Cir. 2011); *Greenview Ag. Ctr., Inc. v. Yetter Mfg. Co.*, 246 Ill. App. 3d 132, 137 (Ill. App. Ct. 1993).

The Illinois Uniform Commercial Code also allows for contracts implied-in-fact. See 810 ILCS 5/2-204. Section 2-204 of the Illinois UCC provides:

(1) a contract for the sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract.
(2) An agreement sufficient to constitute a contract for sale may be found even though the moment of its making is undetermined.
(3) Even though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy.

CS argues that based on the course of dealing from January to mid-July 2009, a reasonable fact finder could only infer the existence of an implied-in-fact contract requiring Oshkosh to purchase from CS any PDS units it required to fulfill its contract with the government. CS refers to six facts that evidence an implied-in-fact contract: that CS personnel traveled to the Aberdeen test site and to trade shows where Oshkosh's marketing vehicles were displayed with CS' powered door system units, in April 2009 Oshkosh asked CS to fill out certain forms to become a certified supplier, that Oshkosh used CS' pricing in connection with its bid to the government, as of June 30, 2009, Oshkosh engineers stated that they expected the M-ATV contract to include the EFP kits and that if it did, CS would be the supplier of the powered door systems, and in September 2009 when Oshkosh chose to purchase PDS units from Parkins instead of CS, Oshkosh filled out a "change of supplier" form for the government.

Oshkosh argues that the facts, including those highlighted by CS, demonstrate that it was attempting to negotiate the terms of an express buyer's option arrangement. Oshkosh highlights three fundamental flaws with CS' argument: (1) none of the facts cited by CS equal an

unambiguous affirmative act by Oshkosh showing that it agreed to the essential terms of the alleged requirements contract and at most indicates ongoing negotiation; (2) the facts cited by CS emphasize the January to May 2009 period, but CS' own statement of undisputed material facts states that negotiation continued at least through June 24, 2009; and (3) CS's argument is unsupported by the two cases it cites.[4] Oshkosh also argues that CS' theory is inherently implausible because Oshkosh would not, based solely on conduct, obligate itself to purchase as much as $421.3 million in goods over 10 years without inquiring if other suppliers could provide the goods at a lower price, especially not without a written agreement. CS has still not put forth any evidence of exclusivity, quantity, or that Oshkosh's alleged acceptance of CS' offer was knowing and voluntary. *See Midcoast Aviation, Inc. v. Gen. Electric Credit Corp.*, 907 F.2d 732, 743 (7th Cir. 1990).

"Courts finding contracts based on parties' conduct have typically done so either where there was repeated and ongoing conduct manifesting an agreement or where the parties had an established course of dealing to which they adhered." *E.C. Styberg Eng'g Co. v. Eaton Corp.*, 492 F.3d 912, 919 (7th Cir. 2007). Here, the record shows that the parties' interaction between January 2009 and June 2009, involved ongoing interaction for research and development of a prototype PDS for Oshkosh's use to bid on a government contract. The situation here is not one where the parties had an established course of dealing, which would allow this Court to simply infer that they acted

---

[4] Control Solutions analogizes two cases – *United States ex rel. J.C. Shaefer Electric, Inc. v. O. Frank Heinz Constr. Co.,* 300 F. Supp. 396. 400 (S.D. Ill. 1969), and *Indus. & Textile Piping, Inc. v. Indus. Rigging Servs., Inc.,* 69 N.C. App. 511 (N.C. App. Ct. 1984). In *Heinz*, although the court found a contract implied-in-fact, it was not a requirements contract. The court inferred a contract from the conduct of the parties, including that the defendant general contract named the plaintiff as a supplier when bidding on the primary contract and was denied a change of supplier when he sought one. Also, in that case, the defendant told the plaintiff supplier "to proceed with the work at the quoted price" and stated the intention to enter a formal agreement at a later date. *Indust. & Textile Piping,* involved an oral express contract where the parties agreed to the specific tasks defendant was to complete, to a time schedule for performance, and to payment terms. The defendant began work and the plaintiff made the first payments. The defendant later refused to sign plaintiff's written subcontract because it contained new terms that had not been agreed upon. The court stated that "the parties' failure to reach agreement on the written subcontract does not preclude the conclusion that an express contract existed." The court based its finding of an express contract on the parties conduct and the letter of intent. Ultimately, the court found that the defendant did not breach the contract because the plaintiff told him to sign the subcontract or leave the job.

12

accordingly. There is no prior course of dealing or history of similar contracts between the parties from which this Court can imply a contract.

### 3. *Statute of Frauds*

Even if this Court were to find that a contract exists, there remains the application of the Statute of Frauds. To be enforceable under the Statute of Frauds, "a writing must be sufficient to indicate that a contract to sell goods exists, be signed by the party against whom enforcement is sought, and state a quantity term." *Zayre Corp. v. S.M. & R. Co.,* 882 F.2d 1145, 1154 (7th Cir. 1989). The Statute of Frauds does not require a writing for a contract that is otherwise valid, if it falls within one of the three enumerated exceptions. *See* 810 ILCS 5/2-201(3). Oshkosh argues that there is no writing that satisfies the Statute of Frauds because none of the parties' correspondences or other documents shows more than agreement on a few terms during negotiation. *See Cent. Ill. Light Co. v. Consol. Coal Co.*, 235 F.Supp.2d 916, 921 (C.D.Ill. 2002). There is no genuine dispute that the Statute of Frauds applies since the alleged contract was for the sale of goods valued over $500, and thus, there must be a written instrument or documents unless one of the three exceptions applies. *See* 810 ILCS 5/2-201(1).

The only potentially applicable exception here is the specially made goods exception.[5] This exception applies "if the goods are to be specially manufactured for the buyer and are not suitable for sale to others in the ordinary course of the seller's business and the seller, before notice of repudiation is received and under circumstances which reasonably indicate that the goods are for the buyer, has made either a substantial beginning of their manufacture or commitments for their procurement." *See* 810 ILCS 5/2-201(3)(a). Control Solutions argues that, based on Judge Bucklo's ruling on Oshkosh's motion to dismiss, it is the law of the case that the alleged contract is within the specially manufactured goods exception and thus no writing is necessary. Oshkosh asserts that

---

[5] The other two exceptions are judicial admission (Oshkosh vehemently denies the existence of a contract) and complete performance (CS has shown no evidence that it completely performed under the alleged contract).

13

Judge Bucklo's ruling only addressed the issue at the pleading stage, but that on summary judgment CS must put forth at least sufficient evidence to create a genuine issue of fact. Oshkosh argues that there is no evidence in the record that CS has made a substantial beginning of the manufacture of the PDS units. Therefore, for this Court to determine whether the exception applies it must resolve the question of what constitutes a "substantial beginning of the manufacture."

While there is a paucity of cases interpreting "substantial beginning of the manufacture," those cases applying this exception have construed the term narrowly, though none in the Seventh Circuit. In *Chambers Steel Engraving Corp. v. Tambrands, Inc*., 895 F.2d 858 (1st Cir. 1990), the First Circuit Court of Appeals held that the designing, developing and manufacturing of a prototype did not constitute a substantial beginning of manufacture. The court further found that the alleged oral contract for 20 to 30 embossing machines comes within the Statute of Frauds, and required a writing to be enforceable. In *Vision Sys., Inc. v. EMC Corp.*, 2005 Mass. Super. LEXIS 67, *14 (Feb. 28, 2005), the court held that Vision's manufacture of 1,247 production units of the Symm SDUs is a contract that is removed from the Statute of Frauds, but that there is no substantial beginning on the 5,653 production units that were not actually manufactured, and constituted the remainder of the purported contract for 6,900 units. In *EMSG Sys. Div. v. Miltope Corp*., 37 U.C.C. Rep. Serv. 2d (Callaghan) 39 (1998), the court found that "the 1,000 sets [of circuit boards] actually produced by Kenmar pursuant to a written purchase order do not constitute a "substantial beginning" for any additional sets not actually manufactured." In *Epprecht v. IBM Corp.,* 36 U.C.C. Rep. Serv. (Callaghan) 391 (E.D. Pa. 1983), the court held that the actual manufacture of 7,000 specially-made machine parts, as part of an alleged oral contract for 50,000 does not constitute a "substantial beginning" sufficient to make the alleged oral contract for the remainder enforceable.

Here, the record shows that Oshkosh ordered four PDS units for use in its bid for the government contract. Oshkosh paid CS $46,000 for the PDS units. There is no evidence that CS

began actual manufacture of PDS units beyond those that Oshkosh purchased for use in its bid or the original prototype. Indeed, the record indicates that the parties continued to negotiate the design even after Oshkosh received the four units. Even if this Court assumes that a contract was formed, there is nothing to show that a final agreed upon PDS unit went into production.

Furthermore, the purpose of the specially manufactured goods exception is to prevent a supplier from being left with goods it cannot sell to anyone else. Here, there are no goods that have been manufactured that CS would be unable to sell. Thus, the four units that Oshkosh used for its government bid would be excepted from the Statute of Frauds (though, there is a written purchase order for those units), based on the cases interpreting "substantial beginning of manufacture," those four units do not exempt any PDS units that were not actually manufactured. Moreover, as Oshkosh points out, once it chose a PDS supplier to fulfill its requirements on the government contract, Oshkosh and Parker its supplier entered into a written requirements contract. This Court finds that no genuine issue of material fact exists on the application of the Statute of Frauds or its exceptions. Since this Court finds that no express or implied contract was formed between the parties, Oshkosh cannot have breached said contract.

*4. Unjust Enrichment (Count III)*

In addition to moving for summary judgment on Counts I and II (the contract claims), Oshkosh also argues that it is entitled to judgment as a matter of law on CS' unjust enrichment and promissory estoppel claims. Under Illinois law, "[t]o state a cause of action based on a theory of unjust enrichment, a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *Village of Bensenville v. City of Chicago*, 389 Ill. App. 3d 446, 491-92 (2d Dist. 2009). Oshkosh argues that unjust enrichment is not a cause of action that can support recovery standing alone, but must be brought about by unlawful or improper

conduct such as fraud, undue influence, etc., that may constitute a separate cause of action. *See Martis v. Grinnell Mut. Reinsurance Co.,* 388 Ill. App. 1017, 10024-25 (3d Dist. 2009). CS asserts that the Seventh Circuit, examining Illinois Supreme Court decisions, has held that unjust enrichment does not need to be grounded in a claim of fraud or other improper conduct. *See Cleary v. Philip Morris Inc.*, 656 F.3d 511, 516 (7th Cir. 2011). In *Cleary,* the Court articulated a means of reconciling the apparent conflicts in cases considering unjust enrichment claims. The court stated:

> "Unjust enrichment is a common law theory of recovery or restitution that arises when the defendant is retaining a benefit to the plaintiff's detriment, and this retention is unjust. What makes the retention of the benefit unjust is often due to some improper conduct by the defendant. And usually this improper conduct will form the basis of another claim against the defendant in tort, contract or statute. So, if an unjust enrichment claim rests on the same improper conduct alleged in another claim, then the unjust enrichment claim will be tied to this related claim – and, of course, unjust enrichment will stand or fall with the related claim." *Cleary v. Philip Morris, Inc.,* 656 F.3d 511, 517 (7th Cir. 2011).

Thus, unjust enrichment may be asserted as a stand alone claim. However, if the improper conduct that forms the basis of the unjust enrichment claim is the same conduct forming the basis for another claim, then either both stand as alternative theories of recovery or both fail. Neither *Cleary* nor the Illinois cases, which form the basis for its analysis, are breach of contract cases.

Here, CS' unjust enrichment claim is based on the same conduct as its breach of contract claim. CS claims that it provided Oshkosh with research, labor, and development of PDS units with the expectation that it would be compensated. Oshkosh argues that it paid CS a premium for the prototype PDS units/door assists and their development through the April 21, 2009, purchase order. CS retained all of the intellectual property rights to its research and development. Moreover, the

government specifically stated that it did not evaluate the PDS units when it considered whether to award Oshkosh the M-ATV contract. Thus, the only detriment that CS has suffered is that Oshkosh did not purchase any more PDS units than the prototypes it used to bid on the government contract. Following the reasoning in *Cleary*, this Court would have to find that Oshkosh and CS had a contract and that Oshkosh breached the contract. Otherwise, there is no unjust retention of a benefit for which CS was not compensated. This Court has found that no contract was formed and thus no breach occurred and the record shows that Oshkosh compensated CS for the production ready prototypes. Accordingly, Oshkosh is entitled to judgment in its favor on this claim.

### 5. Promissory Estoppel (Count IV)

"To establish a claim, the plaintiff must prove that (1) defendant made an unambiguous promise to plaintiff, (2) plaintiff relied on such promise, (3) plaintiff's reliance was expected and foreseeable by defendants, and (4) plaintiff relied on the promise to its detriment." *Newton Tractor Sales, Inc. v. Kubota Tractor Corp.*, 233 Ill. 2d 46, 51 (2009). In Illinois, the statute of frauds is applicable to promises claimed to be enforceable under the doctrine of promissory estoppel. *Fischer v. First Chicago Capital Mkts., Inc.*, 195 F.3d 279, 284 (7th Cir. Ill. 1999) (citing *Architectural Metal Systems, Inc. v. Consolidated Systems, Inc.*, 58 F.3d 1227, 1231 (7th Cir. 1995), and *First Nat. Bank v. McBride*, 267 Ill. App. 3d 367 (1994)). Thus, in order to prevail under the doctrine of promissory estoppel, Control Solutions must present written evidence of an "unambiguous promise" which, but for the existence of bargained-for consideration, would constitute an enforceable contractual agreement. *See Dumas v. Infinity Broad. Corp.*, 416 F.3d 671, 677 (7th Cir. 2005). This claim fails for the same reason as the contract claims. There is no written evidence of an "unambiguous promise" to use CS as the supplier for any and all PDS units Oshkosh requires.

**Conclusion**

Based on the foregoing, this Court should find that the Statute of Frauds applies and that Control Solutions fails to present a writing sufficient to meet the Statute of Frauds because there is no documents or writings establishing exclusivity or quantity (i.e., that CS was to exclusively provide all of Oshkosh's requirements for PDS units). The Court also finds that the alleged oral/implied requirements contract does not meet the specially-made goods exception to the Statute of Frauds because CS did not make a substantial beginning of manufacture. Therefore, this Court denies Control Solutions' motion for partial summary judgment since the evidence presented does not establish an express or implied-in-fact contract.

What is evident from the record is that the parties extensively negotiated towards some sort of supply contract, but not necessarily an exclusive requirements contract. The record also shows that CS developed a prototype PDS unit for Oshkosh's use in its proposal to the government, and that Oshkosh paid a premium ($46,000 for four, where the final production quote was $5,800 each or $23,200 for four) for the production representative units. CS agreed to absorb the cost of developing the prototype and for research and development.

Since this Court finds that Counts I and II based on breach of contract are precluded by the application of the Statute of Frauds, Count IV for promissory estoppel must also fail since the Statute of Frauds applies to it as well and there is no writing or documents indicating an "unambiguous promise" by Oshkosh that CS would be its exclusive supplier for all PDS unit requirements. Count III also fails because CS has not put forth evidence that Oshkosh unjustly retained a benefit. Therefore, Oshkosh's motion for summary judgment is granted.

IT IS SO ORDERED.

Date: July 27, 2012

Entered:_____
Sharon Johnson Coleman